## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

**Edward Butowsky, in his personal and professional capacities,**

    Plaintiff,

**v.**

**Michael Isikoff, Ellen Ratner, and Verizon Communications, Inc.,**

    Defendants

**Case No.  4:20-cv-542**

## ORIGINAL COMPLAINT

NOW COMES Edward Butowsky, the Plaintiff herein, alleging and stating as follows:

### Introduction

1.  From July 9, 2020 until August 6, 2020, Defendant Michael Isikoff produced a series of podcasts about former Democratic National Committee ("DNC") employee Seth Rich, who was murdered on the streets of Washington, D.C. on July 10, 2016.  The series was entitled "Conspiracyland," and it was published by *Yahoo!News*, a subsidiary of Defendant Verizon Communications, Inc.  In that series, Mr. Isikoff repeatedly accused Mr. Butowsky of exploiting the death of Mr. Rich as well as Mr. Rich's family for underhanded political purposes, namely by spreading false conspiracy theories about the death of Mr. Rich. As part of his podcast, Mr. Isikoff interviewed Defendant Ellen

Ratner, an erstwhile journalist and former friend of the Mr. Butowsky. Ms. Ratner made false and defamatory statements about Mr. Butowsky during the interview, and Mr. Isikoff knew they were false because Mr. Butowsky had previously sent Mr. Isikoff evidence showing that Ms. Ratner was not telling the truth.  Mr. Isikoff nonetheless aired Ms. Ratner false statements in *"Conspiracyland,"* and he did so without even mentioning the evidence that disproved Ms. Ratner's false statements.

## Jurisdiction and Venue

2.  This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the Plaintiff resides in Texas, whereas all Defendants reside in other states.

3.  Venue is proper in this district and the Court has personal jurisdiction over all Defendants because they knowingly defamed Mr. Butowsky in a national podcast that was intended to reach Texas and did reach Texas. Furthermore, Defendant Isikoff interviewed the Plaintiff in Texas about things that happened (or purportedly happened) in Texas, and his broadcasts referenced the fact that the Plaintiff resided in Texas.  The Plaintiff alleges that Defendant Ratner knowingly made false statements to Defendant Isikoff for the purpose of undermining and discrediting the Plaintiff in Texas, where he lived and worked.

## Parties

4. Plaintiff Edward Butowksy is a financial advisor who resides in Plano, Texas. He brings claims in his personal and professional capacities.

5.  Defendant Michael Isikoff is a left-wing journalist and the "chief investigative correspondent" for *Yahoo!News*. He works and resides in the Washington, D.C. area.

6. Defendant Ellen Ratner is a journalist, the former Washington Bureau Chief of Talk Media News, and a former news analyst for *Fox News*. She does not reside or work in Texas, but has residences in several other states.

7. Defendant Verizon Communications, Inc. is a Delaware corporation headquartered in New York, New York. *Yahoo!News* is a business and brand within that corporation.

## Facts

### Background

8. The claims against the Defendants are the outgrowth of an extraordinary and unprecedented attempt to overthrow the President of the United States. While *"Conspiracyland"* purported to debunk a conspiracy theory about the murder of Seth Rich, it actually perpetuated a conspiracy theory about Russian interference in the 2016 election. That conspiracy theory will hereinafter be referred to as the "Russia Collusion Hoax" or just the "RCH." Since *"Conspiracyland"* was released, the RCH has unraveled, and the public is beginning to understand the breadth and scope of the conspiracy to overthrow President Donald Trump.

9. Early in his first term, President Barrack Obama began building an Orwellian surveillance state for purposes of spying on his political opponents. Mr. Obama weaponized the Internal Revenue Service, Justice Department, National Security Agency ("NSA"), Federal Bureau of Investigation ("FBI") and Central Intelligence Agency ("CIA"), among others, to surveil opponents of his regime as well as opponents of the Democrat Party. He even used the CIA to spy on journalists, such as former CBS

reporter Sharryl Atkinson, and to spy on the U.S. Senate Intelligence Committee. By 2015, the Obama Administration was spying on prominent Republican presidential candidates, as well as Democratic candidate Bernie Sanders, in an effort to support Democratic candidate Hillary Clinton. During that time, the CIA was headed by Director John Brennan, and the FBI was under the control of Director James Comey and Deputy Director Andrew McCabe. Mr. Brennan and Mr. McCabe are ruthless and unscrupulous Democratic partisans, while Mr. Comey personally despised Donald Trump, and all three were determined to destroy any candidate who might threaten the candidacy of Mrs. Clinton. Mr. Brennan even created a task force within the CIA to sabotage Mrs. Clinton's political opponents, particularly Donald Trump. The task force was created in the summer of 2015 and included personnel from the FBI, NSA, and Defense Intelligence Agency.

10.   As of 2015, Mrs. Clinton's campaign was already dogged by revelations that she had avoided using State Department email systems while she was U.S. Secretary of State, and that she had instead used a private, unsecure email server kept in her home. Adding to Mrs. Clinton's political troubles, classified information was found on her homemade server, and that called into question her competence to handle national security matters. It also rendered her liable to federal criminal charges. By early 2016, Mrs. Clinton was facing multiple investigations, including Congressional, administrative, and criminal investigations, related to the private email server.  Furthermore, the public learned that Mrs. Clinton's attorneys had destroyed more than 30,000 of her emails even though those emails were subject to outstanding subpoenas. In other words, Mrs.

Clinton's lawyers had intentionally and systematically destroyed more than 30,000 pieces of evidence. The ongoing investigations were a political albatross for Mrs. Clinton.

11.   The FBI's criminal investigation of the Clinton email fiasco was known as "Operation Mid-Year Exam" or "MYE," and it was headed by Mr. McCabe and Mr. Comey. Two of the most important players on the MYE team were FBI agents Peter Strzok and Lisa Page, the latter of whom was assigned to the FBI's Office of General Cousel.  Mr. Strzok and Ms. Page were avid Hillary Clinton supporters and partisan Democrats, and they were determined to protect Mrs. Clinton and undermine her opponents at any cost.

12.   Mr. Strzok and Ms. Page were under pressure from Mr. McCabe to finish MYE quickly – and whitewash Mrs. Clinton's crimes – in order to minimize the damage to her political candidacy. They were also directed to shift their attention to Mr. Trump. The Plaintiff alleges on information and believe that Mr. Strzok and Ms. Page regularly worked with the CIA task force described above.

13.   Also in early May of 2016, Mrs. Clinton launched an initiative to divert attention from the mounting evidence that she was corrupt and incompetent. She retained the law firm Perkins Coie, LLP to create a counter-narrative that her opponent, Donald Trump, was not only corrupt, but treasonous. With Mrs. Clinton's approval, Perkins Coie hired the left-wing "investigative" firm Fusion GPS, and Fusion GPS in turn hired former British spy Christopher Steele to fabricate "evidence" that Mr. Trump had colluded with the Russian government. Mr. Steele's fabricated report was then used by Obama Administration officials to secure wiretapping warrants against members of the Trump

campaign. On August 8, 2020, the United Kingdom High Court ordered Mr. Steele to pay $23,000 for publishing "inaccurate or misleading" material in his infamous dossier.

14.   While the Clinton campaign tasked Perkins Coie with hiring Fusion GPS and Christopher Steele, the DNC set in motion the false narrative that the Russian government had hacked its servers. The DNC's ultimate goal was to blame Mr. Trump for colluding with the Russian government to hack its servers. According to an article in *Esquire* magazine, DNC officials found out on May 5, 2016 that the DNC's servers had been breached.  The article claims that the servers had been breached by Russian hackers, and that the DNC asked an internet security company, CrowdStrike, Inc., to investigate the breach. In reality, Perkins Coie had hired CrowdStrike on behalf of the DNC, just like it hired Fusion GPS on behalf of the Clinton campaign, and it did so for the purpose of creating a diversion. Contrary to the *Esquire* story, the DNC had discovered *prior* to May 5, 2016 that one of its own employees had been leaking emails (the DNC likely did not know the identity of the employee at that time, but they knew the leak was internal). The DNC also knew that the emails would soon become public, and it knew that the emails would be very damaging to Mrs. Clinton's political campaign.

15.   Just as Mr. Strzok and Ms. Page realized on May 4, 2016 that they needed to bury the MYE investigation into Mrs. Clinton quickly, the Clinton campaign and the DNC recognized an opportunity to rewrite the narrative about the damaging emails that would soon be released to the public. Rather than acknowledge that a DNC employee was so appalled by the corruption he had witnessed inside the DNC and the Clinton campaign that he leaked emails to Wikileaks, the DNC and Clinton campaign decided

they would instead blame the leaked emails on the Russian government, then blame Mr. Trump for colluding with the Russian government.

16.  The DNC employee responsible for the leaks was Seth Rich, and he was assisted by his brother Aaron. The Plaintiff does not know exactly when the DNC figured out that Mr. Rich was the source of the leak. On July 10, 2016, however, Mr. Rich was fatally shot while walking home in Washington, D.C., and the murder has not been solved. The Plaintiff does not know whether the murder was related to Mr. Rich's role in leaking DNC emails.

17.  Shortly after the murder, the interim DNC chair at the time, Donna Brazile, reached out to Mr. McCabe and Washington, D.C. Mayor Muriel Bowser for help in dealing with the political consequences of the murder. Ms. Brazile knew suspicions would soon arise, fairly or unfairly, that the murder was connected to the email leaks. D.C. police allowed the FBI to unlock Seth Rich's electronic devices, and the FBI obtained data showing that Mr. Rich had indeed provided the DNC emails to Wikileaks. At Mr. McCabe's direction, however, that information was kept secret with orders that it not be produced in response to any Freedom of Information Act request.  For her part, Ms. Bowser directed D.C. police not to pursue any investigative avenues that might connect the murder to the email leaks.  At her direction, local police blamed the murder on a "botched robbery" even though Mr. Rich's watch, wallet, and other belongings were not removed from his body.

18.  On July 22, 2016, Wikileaks began publishing thousands of emails that had been downloaded from the DNC's servers by Seth Rich. Those emails showed how the

campaign of Democratic Presidential nominee Hillary Clinton had corruptly taken control of the DNC for the purpose of sabotaging her primary opponent, Bernie Sanders.  Per their game plan, the Clinton campaign and the DNC immediately claimed that the emails had been obtained by hackers working for the Russian government.

19.  On or about August 9, 2016, Wikileaks founder Julian Assange told a Dutch television interviewer that Wikileaks was offering a $20,000 reward for information about the persons responsible for the murder of Seth Rich, and he strongly inferred that Mr. Rich was the source of the DNC emails published by Wikileaks.

20.  Mr. Butowsky stumbled into the RCH crosshairs after Defendant Ratner, who was then a news analyst for *Fox News* and the White House correspondent for *Talk Media News*, contacted him in the Fall of 2016 about a meeting she had with Mr. Assange. Defendant Ratner's brother, the late Michael Ratner, was an attorney who had represented Mr. Assange. According to Defendant Ratner, she made a stop in London during a return flight from Berlin, and she met with Mr. Assange for approximately six hours in the Ecuadorean embassy. Defendant Ratner said Mr. Assange told her that Seth Rich was responsible for releasing the DNC emails to Wikileaks. Defendant Ratner said Mr. Assange wanted the information relayed to Seth's parents, as it might explain the motive for Seth's murder.

21.  Upon her return to the United States, Defendant Ratner asked Mr. Butowsky to contact the Rich family and relay the information from Mr. Assange, apparently because Defendant Ratner did not want her involvement to be made public. In the two months that followed, Mr. Butowsky did not attempt to contact the Rich family, but he

grew increasingly frustrated as the DNC and #Resistance "journalists" blamed the

Russian government for the email leak. On December 16, 2016, Mr. Butowsky sent a text

message to Defendant Ratner:



Defendant Ratner subsequently told Mr. Butowsky that she had informed Bill Shine, who

was then the co-president of *Fox News*, about her meeting with Mr. Assange in London

22.  On December 17, 2016, at the instigation of Defendant Ratner, Mr. Butowsky

finally contacted Joel and Mary Rich, the parents of Seth, and he relayed the information

about Defendant Ratner's meeting with Mr. Assange. During that conversation, Mr. Rich

told Mr. Butowsky that he already knew that his "sons" were involved in the DNC email

leak, but he and his wife just wanted to know who murdered Seth. Mr. Rich said he was

reluctant to go public with Seth's and Aaron's role in leaking the emails because "we

don't want anyone to think our sons were responsible for getting Trump elected." Mr.

Rich said he did not have enough money to hire a private investigator, so Mr. Butowsky

offered to pay for one.  Mr. Rich accepted the offer and thanked Mr. Butowsky in an

email.

23.  On December 29, 2016 at 1:51 p.m., Mr. Butowsky sent an email to

Defendant Ratner from his iPad: "If the person you met with truly said what he did, is their [sic] a reason you we aren't reporting it ?" At 3:48 p.m. that afternoon, Defendant Ratner responded as follows: "because--- it was a family meeting---- I would have to get his permission-- will ask his new lawyer, my sister-in-law."  Defendant Ratner was referring to Margaret Kuntsler, who had previously been married to Michael Ratner, the brother of Defendant Ratner.  Ms. Kuntsler later told Adam Housely, a *Fox News* reporter who worked with Malia Zimmerman on the Seth Rich story, that Wikileaks would not have offered a reward for information about Mr. Rich's murder if Mr. Rich had not been helping Wikileaks.

24.  Mr. Butowsky later referred the Rich family to Rod Wheeler, a *Fox News* contributor and former homicide detective with the Metropolitan Police Department in Washington, D.C. Mr. Butowsky only knew Mr. Wheeler through his occasional guest appearances on *Fox News*.  Aaron Rich's wife, Molly Rich, drafted a retainer contract for Mr. Wheeler, and he began working directly for the Rich family. Mr. Butowsky agreed to pay for Mr. Wheeler's services, but he had no control over Mr. Wheeler's work for the Rich family.

25.  On May 16, 2017, FoxNews.com published a story by Malia Zimmerman which claimed that Seth Rich had been involved in the DNC email leak. The article undermined the DNC narrative that Seth Rich had been murdered in a "botched robbery," and it likewise undermined the Russia Collusion Hoax. The story featured quotes from Mr. Wheeler regarding his investigation, as well as quotes from an unnamed federal official who claimed that federal investigators had copies of Seth Rich's communications

with Wikileaks. Shortly thereafter, the Rich family terminated Mr. Wheeler, and Mr.

Wheeler was subjected to withering scorn and criticism from anti-Trump media.

26.  On May 23, 2017, *Fox News* retracted the May 16, 2017 article, claiming that

the article did not meet its editorial standards. *Fox News* did not identify any errors in the

article, and there were none.  Within the network, rumors began to circulate that the story

was killed by Kathryn Murdoch, the left-leaning Hillary Clinton supporter and daughter-

in-law of *Fox News* founder Rupert Murdoch. One month prior to the May 23, 2017

retraction, Sarah and Kathryn Murdoch were credited with driving out conservative *Fox

News* host Bill O'Reilly. *See* Don Kaplan, "Rupert Murdoch's sons' progressive wives

helped oust Bill O'Reilly from *Fox News* Channel," *New York Daily News*, April 19,

2017 (https://www.nydailynews.com/news/national/murdoch-sons-progressive-wives-

helped-oust-bill-o-reilly-article-1.3075872). Kathryn previously worked for the Clinton

Climate Initiative, and her husband James was a donor to the Clinton Foundation.

27. The website DebunkingRodWheelersClaims.com (now at

DeBunkingRodWheelersClaims.net) was launched in November of 2017, and it

published texts, emails, audio, and video showing that Rod Wheeler had never been

misrepresented by Mr. Butowsky, Ms. Zimmerman, or *Fox News*, including the email

quoted above in Paragraph 51. The evidence on the website showed unequivocally that

Mr. Wheeler had lied to other media about them. The website also included audio of

famed journalist Seymour "Sy" Hersh stating that he had confirmed that Seth Rich was

responsible for leaking the DNC emails. According to Mr. Hersh, who was by no means a

Republican or a Trump supporter, he could not find a media outlet willing to publish the

Seth Rich story.  Not later than December of 2017, Defendants Ratner and Isikoff were aware of the contents of DebunkingRodWheelersClaims.com.  Mr. Butowsky expressly told Defendant Isikoff about the website, and Defendant Isikoff mentioned the Sy Hersh audio during the "Conspiracyland" podcast.

28.  On May 15, 2018, after Mr. Wigdor got what he needed from Mr. Wheeler in terms of political and public relations impact, Mr. Wigdor and his firm sought to drop Mr. Wheeler as a client. Judge Daniels allowed Mr. Wigdor and his partners to withdraw on May 30, 2018, and Mr. Wheeler's frivolous lawsuit was dismissed on August 2, 2018. The unscrupulous Mr. Wigdor then settled all of his remaining clients' claims against *Fox News* for a $10 million lump sum (rather than the $60 million that he had originally sought), and Mr. Wigdor apportioned $7 million of that among those clients.

29.  In early March of 2017, Joel Rich informed Mr. Butowsky that he had received a call from Brad Bauman, a Democratic political operative, and that Mr. Bauman said he had been "assigned" to the Rich family by the Democratic National Committee ("DNC"). Mr. Bauman is an unscrupulous left-wing political operative, and the DNC assigned him to the Rich family in order to control them and keep the Russia Collusion Hoax alive.  Mr. Bauman knew that Seth Rich leaked emails to Wikileaks, but Mr. Bauman's assignment was to divert attention away from Seth Rich in order to keep the RCH alive. In an attempt to meet that objective, Mr. Bauman designed and organized a "shock and awe" litigation campaign that was designed to discredit and silence anyone who questioned the DNC narrative about Seth Rich.

30.  Under coercion from Mr. Bauman, Joel Rich stopped speaking with Mr.

Butowsky and the Rich family started attacking Mr. Butowsky publicly (albeit not by name). Prior to the time of Mr. Bauman's involvement, the Rich family acknowledged to friends and relatives that Seth and Aaron were involved in the DNC email leak, but then they suddenly changed their story. On information and belief, Mr. Butowksy alleges that Joel, Mary, and Aaron Rich were told that Aaron could be charged with felony computer crimes if they did not cooperate with their new handlers, *i.e.*, Mr. Bauman and the lawyers whom he had recruited to represent the family. Aaron Rich's lawyers have repeatedly alleged, for example, that Mr. Butowsky accused him (*i.e.*, Aaron) of computer crimes and treason. In reality, Mr. Butowsky has never said such a thing. This appears to be an example of psychological projection on the part of the lawyers purporting to represent Aaron. To wit, they have accused their client of committing computer crimes and treason, but they attribute the accusation to Mr. Butowsky.

31. The Rich's lawsuits against Mr. Butowsky (discussed below) are part of a larger pattern. On April 20, 2018, the DNC filed a hare-brained, kamakaze lawsuit alleging that President Trump colluded with the Russians to steal its emails, even though the DNC already knew that neither President Trump nor the Russians had anything to do with the hacking. *See Democratic National Committee v. Russian Federation, et al.*, Case No. 1:18-cv-03501 (S.D.N.Y.). The case was dismissed with prejudice on July 30, 2019. *Id.*, 2019 WL 3423536. The DNC knew it could never win the case, but that was not the objective. The objective was to keep the Russian Collusion Hoax in the headlines through the 2018 Congressional elections. Similarly, Mr. Bauman orchestrated a hyper-aggressive litigation / defamation strategy designed to intimidate, discredit, and ultimately silence

anyone who questioned the DNC narrative about Seth Rich's involvement in leaking emails. In particular, Mr. Bauman recruited the various lawyers to sue Mr. Butowsky into silence. (In fact, a left-wing publication praised the strategy. *See* Amanda Marcotte, "Can lawsuits slow the tide of right-wing conspiracy theory? Seth Rich's family wants to find out," June 1, 2018 *Salon* ([https://www.salon.com/2018/06/01/can-lawsuits-slow-the-tide-of-right-wing-conspiracy-theory-seth-richs-family-wants-to-find-out](https://www.salon.com/2018/06/01/can-lawsuits-slow-the-tide-of-right-wing-conspiracy-theory-seth-richs-family-wants-to-find-out))).

32.   While Mr. Bauman and his legal team were playing offense against Mr. Butowsky by suing and defaming him, their governmental co-conspirators (*e.g.*, Mr. McCabe, Mayor Bowser, and then-Police Chief Kathy Lanier) were playing defense. Mayor Bowser and Chief Lanier, for example, blocked city investigators from pursuing any information that might undermine the RCH narrative. The lead homicide detective assigned to the case, Joseph Dellacamera, was flatly prohibited from revealing the connection between Seth Rich and Wikileaks. *See, e.g.*, Patrick Howley, "Seth Rich Police Detective: Department Gave Me 'Strict, Strict Rules,' If I Talk I'll Get 'Re-Assigned'," August 2, 2017, BigLeaguePolitics.com ([https://bigleaguepolitics.com/seth-rich-police-detective-department-gave-strict-strict-rules-talk-ill-get-re-assigned](https://bigleaguepolitics.com/seth-rich-police-detective-department-gave-strict-strict-rules-talk-ill-get-re-assigned)).  For his part, Mr. McCabe ordered FBI agents to hide all information connecting Seth Rich to Wikileaks, and to deny its existence in response to any FOIA requests.

33.   In his March 22, 2019 report on alleged Russian collusion, Special Counsel Robert Mueller stated unequivocally that Russian hackers were responsible for sending DNC emails to Wikileaks, but he was later forced to admit that his investigators had

never examined the DNC's servers. Instead, Mr. Mueller had relied on exclusively on a *redacted* copy of a report that CrowdStrike had produced for the DNC. So far as the Plaintiff is aware, the U.S. Department of Justice had never before relied exclusively on a private company's report about an alleged computer crime (as opposed to the government conducting its own investigation), and Mr. Mueller certainly did not disclose in his report that he had failed to examine the servers. Furthermore, Mr. Mueller never made any attempt to interview Wikileaks founder Julian Assange, who would know better than anyone else how Wikileaks obtained the DNC emails. On May 7, 2020, Acting Director of National Intelligence Richard Grenell declassified  a transcript of the December 5, 2017 testimony of CrowdStrike CEO Shawn Henry before the House Intelligence Committee, and Mr. Henry admitted in that transcript that his company had no direct evidence that an external source – Russian or otherwise – had hacked the DNC in 2016. In other words, Mr. Mueller had no evidence that Russians hacked the DNC, and his report was a fraud.

34.  Plaintiff's Counsel filed a FOIA lawsuit against the FBI for information about Seth Rich, and the Plaintiff informed the FBI that he intended to use that information for his own litigation purposes. FBI officials told the FOIA court that they searched for records about Seth Rich and did not find any.  Plaintiff's Counsel asked FBI officials to search for responsive emails in the Washington Field Office and in its cyber-division, but they refused. Subsequently, another FOIA requester inadvertently obtained a redacted email string from the Washington Field Office with "Seth Rich" in the header (the requestor obtained the email string by requesting email correspondence between Mr.

Strzok and Ms. Page), but the FBI still refused to search for records in the Washington Field Office.

35.   Deborah Sines, a retired Assistant U.S. Attorney, was assigned to the Seth Rich murder before her retirement. In a March 20, 2020 deposition in *Ed Butowsky v. David Folkenflik*, et al., Case No. 4:18-cv-00442-ALM-CMC (E.D. Tex.), she testified that FBI agents examined Seth Rich's computer and online accounts after his death, that she had exchanged emails with FBI personnel, and that she met with a prosecutor and FBI agent assigned to the office of Special Counsel Robert Mueller about matters pertaining to Mr. Rich. Even after this information was presented to the FBI, it refused to conduct any additional searches for records.

36.   FBI Director Christopher Wray has been informed in writing about the ongoing cover-up, but he has allowed the cover-up to continue unabated.  Director Wray knows that the FBI is hiding evidence that Seth Rich – not Russian hackers – was responsible for transferring DNC emails to Wikileaks, but Director Wray is more interested in protecting powerful friends and allies (as well as the FBI itself) from embarrassment and/or criminal liability.  Similarly, the NSA and its international partners intercepted Seth Rich's communications with Wikileaks, but they have concealed those communications in an attempt to cover up crimes committed by NSA personnel.

**Evidence that DNC emails were leaked, not hacked**

37.   While various corrupt federal officials were promoting the RCH within the government, numerous corrupt journalists were promoting the fraud to the public. Defendant Isikoff, a dutiful scribe for left-wing political interests, was one of those

corrupt journalists.  In his six-part podcast, Defendant Isikoff systematically portrayed the Plaintiff as an unscrupulous political operative who exploited a grieving family and deliberately perpetrated a fraud.  In other words, Defendant Isikoff accused Mr. Butowsky of the very thing that Defendant Isikoff himself was doing, *i.e.*, perpetrating a fraud.

38.  Episode 4 of "Conspiracyland" was released on July 23, 2019. Around the 20-minute mark of that episode, Defendant Isikoff published an interview with Defendant Ratner wherein she denied that she had discussed Seth Rich with Julian Assange. Beginning at the 22:19 mark, she stated as follows: "I'm telling you that did not happen." Thereafter, Defendant Isikoff said the Plaintiff had sent him written messages that he exchanged with Defendant Ratner, and he stated, "We reviewed these messages, and they make no references to Seth Rich whatsoever."  That statement was very deceptive. While it is true that the messages do not mention Mr. Rich by name, they nonetheless corroborate the fact that Defendant Ratner relayed information to Mr. Butowsky from Mr. Assange. On December 29, 2016 at 1:51 p.m., Mr. Butowsky sent the following text message: "If the person you met with truly said what he did, is their [sic] a reason you we aren't reporting it ?" At 3:48 p.m. that afternoon, Defendant Ratner responded as follows: "because— it was a family meeting—– I would have to get his permission– will ask his new lawyer, my sister-in-law." As noted above, Defendant Ratner's former sister-in-law was representing Julian Assange, and the only subject that Defendant Ratner relayed to Mr. Butowsky was Mr. Assange's statements about Seth Rich.  The Plaintiff alleges that Defendant Ratner lied because she was feeling pressure from her fellow leftists to

conform to the RCH narrative.  Defendant Isikoff knowingly misrepresented the text

messages because he was actively promoting the RCH narrative, and because he was

trying to discredit the Plaintiff.

39.  In Episode 4, Defendant Isikoff omitted reference to a November 5, 2016

video wherein Defendant Ratner acknowledged to a public audience that Mr. Assange

told her that Wikileaks obtained the emails from an "internal source," not the Russians. A

clip of that video can be seen at https://www.youtube.com/watch?v=0M3Z4eE6cJA.

Defendant Ratner's public statement begs a question: who was the "internal source" at

the DNC if not Seth Rich?  Defendant Isikoff never asked that question of Defendant

Ratner, even though the Plaintiff made Defendant Isikoff aware of the November 5, 2016

video before *"Conspiracyland"* was published.  In any event, the evidence shows that

Defendant Ratner – not the Plaintiff – made false statements about her conversation with

Mr. Assange, yet Defendant Isikoff deceptively edited the podcast to make it sound as if

the Plaintiff was lying.  Defendant Isikoff deliberately omitted reference to the video in

order to discredit the Plaintiff by portraying him as a liar.

40.  Later in Episode 4, Defendant Isikoff edited an interview to make it sound as

if the Plaintiff was waffling about the last time that he spoke to Steve Bannon. In reality,

the Plaintiff last spoke with Mr. Bannon approximately two years before the 2016

election, which was approximately four years before the interview.  Mr. Butowsky did

not lie or give conflicting answers about when he had last spoken with Mr. Bannon, but

Mr. Isikoff edited the podcast to make it appear that way.

41.  In Bonus Episode 4, around the 5:30 mark, Defendant Isikoff accused the

Plaintiff of "conspiring" with Rod Wheeler "to develop a story for *Fox News* that could support the Seth Rich conspiracy narrative." Throughout *"Conspiracyland"*, Defendant Isikoff referred to the *Fox News* story as "bogus," "false," or "fake," and he implicitly and explicitly accused Mr. Butowsky of intentionally spreading disinformation. Those statements were false and defamatory.

42.  At the 6:00 minute mark of Bonus Episode 4, Defendant Isikoff falsely claimed, "There is a discrepancy about what Ed Butowsky says and almost everybody else he talked to..." At the 8:00 minute mark, Defendant Isikoff referred to Defendant Ratner: "She never knew anything about Julian Assange telling her about Seth Rich's being a source because the subject never came up." The foregoing statements are likewise false and defamatory, particularly in light of the fact that Defendant Isikoff already knew about Defendant Ratner's videotaped comments from 2016.

43.  More than once, Defendant Isikoff falsely alleged that Mr. Butowsky hired Mr. Wheeler, but in reality the Rich family hired Mr. Wheeler and even drafted the retainer contract. Mr. Butowsky merely made an introduction and offered to pay for whomever they hired.

44.  Episode 5 of "Conspiracyland" was released on July 30, 2020. In that episode, Defendant Isikoff said, "Butowsky for his part sued David Folkenflik and NPR over its reporting on his role in shepherding the bogus story." The Plaintiff did not, however, shepherd a "bogus" story. Defendant Isikoff then falsely implied that the Plaintiff was intentionally exploiting the Riches.

45.  In Bonus Episode 5, Defendant Isikoff accused Mr. Butowsky of working

with Malia Zimmerman to get a "bogus story" to *Fox News*. Again, the story was not

"bogus." Around the 3:20 mark, Defendant Isikoff suggested that Mr. Butowsky was part

of a "band of conspiracy mongerers." Shortly thereafter, he suggests that the Plaintiff

might be lying about whether he had conversations with Donald Trump: "We don't know

with Ed Butowsky – you're never quite sure. He couldn't keep straight the last time he

talked to Steve Bannon." In reality, the Plaintiff could keep straight the last time he

talked to Mr. Bannon, *i.e.*, two years before the election, which was approximately four

years before the interview.  Defendant Isikoff tried to "spin" the facts in order to discredit

Mr. Butowsky.

46.  Episode 6 of "Conspiracyland" was released on August 6, 2020.  Around the

5:15 mark of that episode, Defendant Isikoff again impugned the motives of Mr.

Butowsky (among others): "The story provides an illuminating window into how these

crazy theories are spawned and manipulated in the swirl of social media, sometimes for

case, sometimes for publicity, and often for brazenly dishonest political purposes." At the

9:20 mark, he falsely stated, "There's not a shred of evidence [Seth Rich] leaked any

emails to Wikileaks."  In reality, there is extensive evidence that Mr. Rich leaked emails

to Wikileaks.  Among other things, (1) the FBI and NSA are concealing direct evidence

that Mr. Rich evidence sent DNC emails to Wikileaks; (2) Mr. Assange offered a reward

for help in identifying Mr. Rich's murderer; (3) Mr. Assange told Ms. Ratner that Mr.

Rich was the source of the leaks; (4) Ms. Ratner said publicly that the emails came from

an "internal source"; and (5) former NSA scientist Bill Binney (among others) have

explained in great technical detail that the emails published by Wikileaks could not have

been obtained by Russian hackers.

47.  In the same episode, Defendant Isikoff referred to the *Fox News* report as a "fake story," and he referred to Mr. Butowsky as "the man behind the *Fox News* debacle." Around the 41:18 mark, Defendant Isikoff stated that Mr. Rich's death was "cynically hijacked by a rogue's gallery... all of whom promoted baseless, false, and dangerous versions of events, seemingly without any consequences. There was, of course, a political purpose to all of this conspiracy mongering – to protect Trump and deflect attention from the Russian attack..." Although the Plaintiff was not mentioned by name in that sentence, the context of *Conpiracyland* clearly indicates that the Plaintiff was part of that group.  Any reasonable listener would know that Defendant Isikoff was talking about Mr. Butowsy.

48.  Bonus Episode 6 is perhaps the most egregious, as it accused the Plaintiff of deliberate manipulation and exploitation. Referring to the Plaintiff, Mr. Isikoff stated, "Here are all these hucksters coming around offering to help [the Rich family] when they clearly have a political agenda." The Plaintiff did not reach out to the Riches because of a "political agenda," and he certainly is not a "huckster." In the same episode, Defendant Iskoff stated, "Ed Butowsky played a big role in engineering that completely bogus story that *Fox News* took down..." Mr. Butowsky did not, however, "engineer" a "bogus story."

49.  The Plaintiff did not learn about Episodes 5 and 6 until late July of 2019. On August 2, 2019, Plaintiff's Counsel sent letters to all of the Defendants requesting retractions and citing Texas Civ. Prac. & Rem. Code §73.055.  None of the Defendants issued retractions or otherwise made corrections.

## Claims

## Defamation

50.  All previous paragraphs are incorporated herein by reference.

51.  The Plaintiff brings defamation claims against the Defendants because they or their agents published or conspired with others to publish false and defamatory statements about him as described above. The Plaintiff brings defamation claims based on the false statements identified above as well as the overall "gist" of the "Conspiracyland" series.  The "gist" of "Conspiracyland" was that the Plaintiff dishonestly exploited a grieving family in order to perpetrate a fraud. The Plaintiff alleges that the Defendants are liable for defamation *per se* and defamation *per quod*. *See Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018), reh'g denied (Sept. 28, 2018), cert. denied, 139 S. Ct. 1216, 203 L. Ed. 2d 208 (2019)("Defamation per se occurs when a statement is so obviously detrimental to one's good name that a jury may presume general damages, such as for loss of reputation or for mental anguish"), citing *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013); *see also Memon v. Shaikh*, 401 S.W.3d 407, 421 (Tex. App.—Houston [14th Dist.] 2013), judgment withdrawn, 14-12-00015-CV, 2014 WL 6679562 (Tex. App.—Houston [14th Dist.] Nov. 25, 2014, no pet.)(statement is defamation per se if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury"), quoting Tex. Civ. Prac. & Rem.Code Ann. § 73.001.

- 22 -

## Business Disparagement

52.  All previous paragraphs are incorporated herein by reference.

53.  The Plaintiff brings business disparagement claims against all Defendants because they or their agents published or conspired with others to publish false and defamatory statements that caused harm to his business and profession. The Plaintiff's work is regulated by the Securities and Exchange Commission, and allegations of fraud or dishonesty can cost him his professional licenses.  Likewise, the Defendants allegations of fraud and dishonesty have cost him the trust (and business) of potential clients.

## **Request for Relief**

54. The Plaintiff respectfully prays that upon a final hearing of this case, judgment be entered for him against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; back pay; costs of court; attorney fees; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

**/s/ Ty Clevenger**

Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorney for Plaintiff Edward Butowsky**